IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CE DESIGN LTD.**, an Illinois corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 09 C 2057 |
| v. | ) ) ) | |
| **KING ARCHITECTURAL METALS, INC.**, | ) ) ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff CE Design Ltd. ("CE Design") sued King Architectural Metals, Inc. ("King"), alleging that King violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, by sending advertisements to its fax machine without its consent. CE Design seeks to bring the suit as a class action on behalf of:

> [a]ll persons who, during the period January 30, 2009 to May 18, 2009, were sent, without prior express permission or an established business relationship, a telephone facsimile message advertising the commercial availability of Defendant's property, goods, or services.

For the reasons discussed below, the motion for certification is granted, subject to the modification of the class definition explained herein.

I.

King is a manufacturer and distributor of metal building components. In 2009, King decided to begin advertising its

products by sending faxes to current and prospective customers. To this end, King contracted with two fax broadcasting companies, ProFax and Westfax. King provided the companies with distribution lists consisting of the fax numbers to whom the advertisements were to be sent. These numbers were taken from several of King's databases. Also included on the lists were fax numbers of potential customers purchased from third parties such as Dun & Bradstreet.

The companies began sending the faxes on January 30, 2009. After receiving notice of the instant suit, on March 8, 2009, King limited the distribution list to its existing customers; and on May 18, 2009, King discontinued sending the faxes altogether. According to CE Design's expert, Robert Biggerstaff, during the period from January 2009 to May 2009, 143,257 unique fax numbers received a total of 669,917 successful fax transmissions.

II.

Under Fed. R. Civ. P. 23, class certification is appropriate if CE Design can show: "(1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class." *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748, 760

(7th Cir. 2000). In addition, a proposed class must satisfy at least one of the categories of Rule 23(b). *See, e.g.*, *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002). In this case, CE Design contends that the proposed class meets Rule 23(b)(3)'s requirement that questions of law or fact common to class members predominate over questions affecting individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

**Rule 23(a): Typicality & Adequacy**

There is no dispute as to whether the proposed class meets the first two requirements of Rule 23(a): the class is so numerous that joinder of all members would be impracticable; and the class shares common questions of law and fact because the class members' claims arise out of a common nucleus of operative fact. *See, e.g.*, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ("A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2).").

However, King argues that the class fails to meet Rule 23(a)'s typicality and adequacy requirements. According to King, CE Design's claim is not typical of the class, and therefore cannot adequately represent the class, because its claim is vulnerable to unique defenses and objections. *See, e.g.*, *Pezl v. Amore Mio, Inc.*, 259 F.R.D. 344, 348 n.8 (N.D. Ill. 2009) (presence of

defenses unique to the named plaintiff undermines adequacy of representation). Specifically, King contends that CE Design's claim fails because it consented to receive the faxes in question. King does not claim to have received express permission to send the faxes directly from CE Design. Rather, King claims that CE Design consented by posting its fax number on its website (along with the invitation, "Call Us"); and by signing a form authorizing the publication of its fax number in the "Blue Book," a regionalized directory similar to the Yellow Pages that lists civil engineering firms and other commercial construction professionals. King points out that in placing its advertisement in the Blue Book, CE Design signed a form containing the following provision: "By supplying The Blue Book with your fax and e-mail address, you agree to have The Blue Book and users of The Blue Book services communicate with you via fax or e-mail." King argues that since CE Design consented to receiving the faxes, and since the TCPA applies only to faxes sent without consent, CE Design's claim fails and it therefore cannot represent other class members' claims.

The assumption on which this argument is founded -- that CE Design consented to receiving King's faxes -- is mistaken. Courts and other authorities interpreting the TCPA have stated that express permission must be obtained from the intended recipient, and that express permission requires that the party agree not simply to receive faxes but to receive faxed *advertisements* from

the plaintiff.  As the FCC has explained:

> fax numbers are published and distributed for a variety of reasons, all of which are usually connected to the fax machine owner's business or other personal and private interests. The record shows that they are not distributed for other companies' advertising purposes. Thus, a company wishing to fax ads to consumers whose numbers are listed in a trade publication or directory must first obtain the express permission of those consumers. Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements.

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14129 (F.C.C.)-14130 (F.C.C.), 2003 WL 21517853,), 2003 WL 21517853 (2003); *see also Hinman v. M and M Rental Center, Inc.*, 596 F. Supp. 2d 1152, 1161-62 (N.D. Ill. 2009) ("[E]vidence that plaintiffs published or otherwise distributed their fax numbers to particular recipients, such as clients and vendors, in the course of conducting their business does not amount to consent.").

By agreeing to the Blue Book's Terms and Conditions, CE Design may have consented to receiving faxes, but it did not expressly consent to receiving faxed *advertisements*.  As CE Design points out, businesses publish their fax numbers in the Blue Book for the purpose of advertising their own services, not in order to solicit advertisements from others.  *See* Reply at 6.  It is equally evident that CE Design did not expressly consent to receiving fax advertisements by displaying its fax number on its website.

The cases to which King looks for support, *Travel 100 Group,*

-5-

*Inc. v. Mediterranean Shipping Co. (USA) Inc.*, 889 N.E.2d 781 (Ill. App. Ct. 2008), and *Landsman & Funk, P.C. v. Lorman Business Ctr., Inc.*, No. 08-cv-481-bbc, 2009 WL 602019 (W.D. Wisc. Mar. 9, 2009), are distinguishable. In both cases, the plaintiffs expressed their consent to receive fax advertisements in clear and distinct terms. Thus, in *Travel 100*, the court noted that "Travel 100 went beyond simply agreeing to the inclusion of its contact information in [an industry] database." *Travel 100*, 889 N.E.2d at 798. Rather, "[v]arious representatives of Travel 100 submitted the agency's contact information upon being told that [its information would be released] to any industry supplier that may wish to use Travel 100's services." *Id.* (quotation marks omitted). Moreover, a Travel 100 employee completed and returned a questionnaire containing a provision stating that "Travel 100's contact information assures that suppliers will direct relevant promotions and . . . trip information to our participants." *Id.* Similarly, in *Landsman*, the plaintiff received faxes after signing a seminar enrollment form that stated: "PROVIDING YOUR FAX NUMBER CONSTITUTES AN EXPRESS INVITATION TO SEND YOU FAX ADVERTISEMENTS ABOUT FUTURE LORMAN SEMINARS." *Landsman*, 2009 WL 602019, at *2. CE Design has not expressed its consent to receive fax advertisements from King with similar explicitness.

King advances two additional objections that might be regarded as challenges to CE Design's ability, and the ability of its

President, John Pezl ("Pezl"), to adequately represent the proposed class. First, King complains that CE Design is a repeat plaintiff, having brought more than one hundred TCPA suits against other defendants based on unsolicited fax broadcasting. According to King, CE Design could easily take steps to avoid receiving unwanted faxes but has refused to do so. (This prompted King to send CE Design a new fax machine, free of cost, that can be programmed to block unwanted faxes). Initially, King's complaints on this score were not advanced in the form of a specific legal argument. However, in its sur reply, King appears to advance these considerations to argue that CE Design lacks standing. According to King, "[t]he evidence shows that Mr. Pezl is not a victim of unsolicited faxes, but an opportunist who invites them. One who consents to an act cannot be injured by it, and one without injury has no standing under Article III to bring an action on his own behalf, let alone on behalf of others." Sur Reply at 6.

This argument is without merit. Simply put, opportunism of the kind alleged by King does not deprive a party of standing. Indeed, the Seventh Circuit recently remarked upon CE Design's penchant for TCPA litigation. *See CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 445 n.2 (7th Cir. 2010) ("We think it's worth noting that CE Design is no stranger to junk fax litigation; it has filed more than 100 similar suits under the TCPA."). Nothing in the court's decision intimates that this brings CE Design's standing

into question.

Along similar lines, King claims that Pezl has testified falsely in these proceedings and that, as a result, he should not be permitted to represent the proposed class.  King points out that although Pelz testified during his deposition in this case that he had never before seen the Blue Book's Terms and Conditions, documents from CE Design's earlier TCPA cases establish that Pelz had indeed seen the document.  While there does appear to be a discrepancy in Pezl's testimony on this point, this isolated example is not sufficient to call Pezl's credibility into question.[1]  This is especially so in light of the fact that the issue about which Pezl is alleged to have testified untruthfully -- his familiarity with the Blue Book's Terms and Conditions -- is immaterial to the outcome of this case.  As explained above, regardless of whether Pezl was aware of the Terms and Conditions, the decision to advertise in the Blue Book does not constitute express permission to send advertising faxes to CE Design.

In short, CE Design has satisfied the requirements of Rule 23(a).

---

[1] I note that similar accusations have been made against Pezl in other cases.  *See CE Design v. Beaty Const., Inc.*, No. 07 C 3340, 2009 WL 192481, at *6 * n.3 (N.D. Ill. Jan. 26, 2009) (defendant claimed that Pezl failed to disclose CE Design's membership in the Blue Book).

**Rule 23(b): Predominance & Superiority**

King next argues that certification is inappropriate because CE Design is unable to meet Rule 23(b)'s predominance and superiority requirements. King contends that CE Design cannot show predominance because several issues central to the class members' claims require individualized inquiries. Foremost among these, according to King, is the issue of consent. King maintains that some recipients of the faxes requested or otherwise expressed their consent to receive its advertisements. Unfortunately, King says that its databases, and the distribution lists derived from them, did not track information concerning those who had consented and those who had not. As a result, King claims, it will be necessary to inquire on a case-by-case basis into whether particular class members consented to receiving the faxes. These individualized inquiries, King maintains, will predominate over the common issues.

This argument is asserted very frequently by defendants in opposition to class certification in TCPA cases involving fax broadcasting; and it is true that a number of courts have declined to certify classes in such cases on the ground that the issue of consent could not be proved on a class-wide basis. *See, e.g.*, *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th Cir. 2008); *Hicks v. Client Services, Inc.*, No. 07-61822, 2008 WL 5479111, at *7 (S.D. Fla. Dec 11, 2008). As an initial matter, these decisions are not binding here. *See, e.g.*, *United States v. Glaser*, 14 F.3d 1213,

1216 (7th Cir. 1994). Moreover, the weight of authority, particularly in this District, is to the contrary. *G.M. Sign, Inc. v. Group C Communications, Inc.*, No. 08-cv-4521, 2010 WL 744262, at *6 (N.D. Ill. Feb. 25, 2010); *Targin Sign Systems, Inc. v. Preferred Chiropractic Center, Ltd.*, 679 F. Supp. 2d 894 (N.D. Ill. Jan. 21, 2010); *CE Design v. Beaty Const., Inc.*, No. 07 C 3340, 2009 WL 192481, at *7 (N.D. Ill. Jan. 26, 2009); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.*, No. 06 C 949, 2008 WL 3889950, at *6 (N.D. Ill. Aug. 20, 2008); *Green v. Service Master On Location Services Corp.*, No. 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009); *Hinman*, 545 F. Supp. 2d 802; *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 645 (W.D. Wash. 2007).

King argues that the latter cases are distinguishable because they involve faxes that were sent to leads purchased from a third party. Since there is no reason to assume any prior relationship between advertisers and leads obtained in this manner, there is no reason to think that recipients of the faxes in these cases could have consented to receiving the faxes. But this reading of the cases is not correct. In some of these instances, the classes certified consisted, as is true here, of both existing customers and purchased leads. *See, e.g.*, *Holtzman v. Turza*, No. 08 C 2014, 2009 WL 3334909, at *1 (N.D. Ill. Oct. 14, 2009) (distribution list "included a combination of fax numbers defendant purchased from the Illinois CPA Society, and numbers he obtained from clients,

advisors, business acquaintances, and people who attended various seminars he taught"); *Kavu*, 246 F.R.D. at 645.

Moreover, King's allegations of consent on the part of certain of the class members is problematic. King states that "[o]ver the last several years, King has received on average approximately 1,000 requests per week from contacts seeking sales information." Sur Reply at 11. It also claims that "individuals contact King by mail, email, web site inquiry and telephone specifically to request that King include them in future catalogues and sales materials." *Id.* Further, King notes that some of the fax numbers on the distribution lists belonged to its existing customers. *Id.*

But even if these allegations are true, it would not establish consent on the part of these recipients. For example, simply requesting to be sent catalogs and sales materials does not constitute express consent to receive facsimile advertisements. Furthermore, CE Design has agreed to modify the class definition so as to exclude businesses with whom King had an existing relationship at the time the faxes were sent. Under the revised definition, the class would consist of:

> [a]ll persons who, during the period January 30, 2009 to March 8, 2009, were sent, without prior express permission or an established business relationship, a telephone facsimile message advertising the commercial availability of Defendant's property, goods, or services. Persons who were Defendant's customers prior to this time period are excluded from the class.

Reply at 18.

In light of this change, the class would include only recipients whose fax numbers were purchased (a group with respect to which classes have routinely been certified) and prospects (a group that, by King's own account, can be segregated from existing customers). To be sure, King claims that some of the contacts designated as prospects have separately consented to receiving the advertisements. Even assuming this is true, however, common issues would still predominate over the individual ones. Further, to the extent that King claims the individual determinations cannot be made without undue hardship, its claim rings hollow. King's failure to keep orderly records should not be permitted to foil certification motions. *Cf. Macarz v. Transworld Systems, Inc.*, 193 F.R.D. 46, 57 (D. Conn. 2000) ("Should a debt collection company as large and as sophisticated as Transworld be able to avoid class action liability by mere fact of inadequate record-keeping, the Congressional purpose behind the statute would indeed be thwarted.").

In addition to the issue of consent, King contends that individualized inquiries will be necessary with respect to other elements of class members' claims. In particular, King argues that inquiry will be necessary concerning whether: (1) the fax transmissions were successfully received; (2) the fax transmissions were sent to a "telephone facsimile machine" within the meaning of the TCPA; and (3) the transmissions were sent over a "regular telephone line" within the meaning of the TCPA.

In connection with the issue of whether the faxes were successfully transmitted, King cites the report of its expert, Ray Horak ("Horak"), which purports to identify errors and other problems with the data supplied by ProFax and WestFax concerning various fax transmissions. Based on these errors, Horak claims that the transmission information is unreliable. *See* Horak Decl., Def.'s Sur Reply, Ex C at 4. As a result, King concludes, determining whether class members actually received the faxes would have to be undertaken on a case-by-case basis.

One problem with this argument is that the TCPA does not require that fax transmissions be *received*, only that they be sent. *See Hinman*, 596 F. Supp. 2d at 1159 ("On its face, the statute prohibit the sending of unsolicited fax advertisements and make no reference at all to receipt, much less to printing."). As a result, courts have held in fax broadcasting cases such as this one that "plaintiffs need not identify which specific fax numbers successfully received defendants' transmission from a list of numbers to which the transmission was indisputably sent." *Saf-T-Gard Intern., Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312, 315 (N.D. Ill. 2008); *see also Clearbrook v. Rooflifters, LLC*, No. 08 C 3276, 2010 WL 2635781, at *3 (N.D. Ill. June 28, 2010).

Moreover, Horak's assessment of the transmission information's reliability is speculative. Horak fails to cite a single instance in which a transmission was incorrectly reported as having been

sent. Instead, his analysis is confined to unsuccessful attempts at transmission. The report examines a number of cases in which, according to Horak, the transmission logs' explanation for the failure is erroneous. From this, Horak infers that the transmission logs as a whole are unreliable. Similar arguments have been advanced in other cases and have been squarely rejected. *See, e.g.*, *Holtzman v. Turza*, No. 08 C 2014, 2009 WL 3334909, at *5 (N.D. Ill. Oct. 14, 2009) ("Plaintiff has proffered the fax transmission logs documenting the contacts to whom MessageVision successfully sent the fax. These logs are sufficient to at least circumstantially prove that 8,630 faxes were successfully transmitted to 221 individual numbers who thus received the "Daily Plan-It" fax."); *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009).

Also unpersuasive is King's claim that individual inquiries will be necessary to determine whether the faxes in question were sent to a "telephone facsimile machine" within the meaning of the TCPA. The TCPA defines "telephone facsimile machine" as:

> equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

47 U.S.C. § 227(a)(3).

In his expert report, Horak notes that faxes can be received by a wide array of machines and devices, from traditional stand-alone fax machines to laptop computers to cellular telephones. He

further argues that not all of these devices are covered by the TCPA's definition of a "telephone facsimile machine." For example, according to Horak, devices such as PCs and computerized fax scanners meet the definition when, and only when, they are directly attached local peripheral scanners and/or printers. Thus, individuals who received the faxes in question on a computer or other device not equipped in this manner will not qualify for membership in the proposed class. Based on a review of market data for various devices capable of receiving faxes, Horak goes on to opine that "a substantial percentage of the faxes at issue undoubtedly were sent to and received by devices that do not satisfy the TCPA definition of a telephone facsimile machine." Horak Decl. at 9. According to King, this means that in order to adjudicate class members' claims, it will be necessary to make individualized determinations into the kind of device by which each class member received the faxes in question.

The first problem with this argument is that it proves too much. According to Horak's view, whenever large numbers of faxes are sent, the transmissions are likely to be received by devices that may not be covered by the TCPA. Since in each case this would require particularized investigation into every potential class member's receipt of the fax, class certification under the TCPA would become a virtual impossibility. This conclusion is untenable. The statute says nothing to suggest such a view; and, despite the

fact that class actions have routinely been certified in TCPA cases, Congress has not amended the statute in order to forbid class actions.

Nor is Horak's position supported by case authority. The decisions on which King relies simply do not substantiate Horak's view. For example, *Aronson v. Bright-Teeth Now, LLC.*, 824 A.2d 320 (Pa. Super. 2003), simply affirmed the well-settled proposition that advertisements sent via *email* as opposed to fax machines were not prohibited by the TCPA. *Bernstein v. American Family Ins. Co.*, 2005 WL 1613776, at *1 (Ill. Cir. 2005), did not address the TCPA's definition of "telephone facsimile machine" at all; rather, the court declined to certify the class on the ground that, due to a conflict of interest, the proposed class counsel could not adequately represent the class. *Levine v. 9 Net Ave., Inc.*, No. A-1107-00T1, 2001 WL 34013297, at *5 (N.J. Super. A.D. June 7, 2001), held that a person who receives a fax on his or her computer and is able to decide whether or not to print it out, has consented to the advertisement. But it is not clear how this supports Horak's position, and in any event, *Levine* is overshadowed by substantial case authority to the contrary. *See, e.g.*, *Holtzman v. Caplice*, No. 07 C 7279, 2008 WL 2168762, at *7 (N.D. Ill. May 23, 2008); *see also Hinman*, 596 F. Supp. at 1159 ("[T]he FCC has specifically rejected the argument defendant makes here, that faxes received by networked fax machines (which allow recipients to view and discard unwanted

faxes prior to printing them) are beyond the reach of the statute.").

It is also important to note that the mere existence of individual issues is not enough to preclude class certification. *See, e.g.*, *Vodak v. City of Chicago*, No. 03 C 2463, 2008 WL 687221, at *3 (N.D. Ill. Mar. 10, 2008) (noting that "the existence of individual issues does not necessarily defeat class certification"); William B. Rubenstein, Alba Conte and Herbert B. Newberg, 2 Newberg on Class Actions § 4:25 (4th ed. 2010) ("Regarding predominance, although a court must examine the relevant facts and both the claims and defenses in determining whether a putative class meets the requirements of Rule 23(b)(3), the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. Instead, as long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3).") (quotation marks omitted). Thus, even if King were able to show that individual inquiries would be necessary into whether the class members received the faxes via a "telephone facsimile machine," common issues still would predominate. *See, e.g.*, *Kavu*, 246 F.R.D. at 652 ("[A]lthough it will have to be determined whether class members received the relevant facsimile and received it by 'telephone facsimile machine'

as set forth in the statute, those two individual issues do not defeat certification."). King's final argument with respect to the predominance requirement is that individual inquiries will be necessary to determine whether the faxes were transmitted over "regular telephone lines." This is a potentially complicated issue, since the TCPA does not define the term "regular telephone line," and cases and other authorities are silent on the question. Based on Horak's report, King claims that only analog telephone lines constitute "regular telephone lines" for purposes of the TCPA, and that since the faxes at issue here were sent over digital lines, they cannot form the basis for liability. Whatever the merits of King's position, however, it is unnecessary to address the issue for purposes of this motion. For King does not claim that individual inquiries will be necessary to determine what type of phone line was used to send the faxes. Rather, for each fax broadcast, the same type of phone line was presumably used to send all of the faxes. As a result, this is an issue that can be resolved on a class-wide basis.

Finally, King argues that class certification is not a superior method of adjudicating the plaintiffs' claims. According to King, this is because "the crushing statutory penalties stemming from a finding of liability as to a certified class would far exceed any plausible deterrent value and grossly exceed the minor injury suffered," and because "[c]ertification and liability at $500 per

-18-

proposed class member would jeopardize King's viability and the employment of its 200 employees." Sur Reply at 14. Nevertheless, as King recognizes, the same argument was rejected in *Hinman*. *Hinman*, 545 F. Supp. 2d at 807 ("It also appears that resolution of the issues on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both judicial and party resources. The superiority requirement of Rule 23(b) is therefore satisfied."). King also admits that the Seventh Circuit has rejected "crushing statutory liability" as a basis for denying class certification in the context of other statutes. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953-54 (7th Cir. 2006) ("Many laws that authorize statutory damages also limit the aggregate award to any class . . . . Other laws, however, lack such upper bounds . . . . While a statute remains on the books . . . it must be enforced rather than subverted. An award that would be unconstitutionally excessive may be reduced, but constitutional limits are best applied after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure. Reducing recoveries by forcing everyone to litigate independently -- so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims -- has little to recommend it."). In short, CE Design has shown that "class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

III.

Since CE Design has met all of Rule 23's requirements, its motion to certify the following class is granted:

> All persons who, during the period January 30, 2009 to March 8, 2009, were sent, without prior express permission or an established business relationship, a telephone facsimile message advertising the commercial availability of Defendant's property, goods, or services. Persons who were Defendant's customers prior to this time period are excluded from the class.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: December 13, 2010