**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| CE DESIGN LTD. and PALDO SIGN AND ) | |
| DISPLAY COMPANY, Illinois corporations, ) | |
| individually and as the representatives of a ) | |
| Class of similarly-situated persons, ) | No. 09 CV 2057 |
| ) | |
| Plaintiffs, ) | Magistrate Judge Schenkier |
| v. ) | |
| ) | |
| KING SUPPLY COMPANY, LLC d/b/a ) | |
| KING ARCHITECTURAL METALS, INC., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE IN OPPOSITION
TO VALLEY FORGE INSURANCE COMPANY, NATIONAL FIRE INSURANCE
COMPANY OF HARTFORD AND CONTINENTAL CASUALTY COMPANY'S
MOTION TO INTERVENE AND STAY**

At the January 13, 2012 hearing, the Court identified a number of topics over which it wished to hear further from the parties. Thus, pursuant to leave given at that hearing, Plaintiffs submit this supplemental response discussing why (1) the insurers abandoned whatever interest they had in intervention when they denied King's tender of defense and washed their hands of the case; (2) Illinois law will govern settlement reasonableness issues; and (3) as the Court noted, *Creative Montessori Learning Centers v. Ashford Gear, LLC*, 662 F. 3d 913 (7th Cir. 2011), has nothing to do with any issues relevant to the approval of the settlement in this case (or, indeed, with class settlements or insurance issues generally) and there are no other decisions disapproving of the settlement structure.

1

## ARGUMENT

**I.  THE INSURERS ABANDONED ANY INTEREST THEY HAD IN THIS LITIGATION WHEN THEY DECLINED TO DEFEND.**

As discussed previously, either Rule 24(a) or (b) require that the insurers have an interest that they timely moved to protect and the proposed intervention here was in no way timely.  In addition, any interest the insurers had was abandoned when the insurers declined King's tender of defense and relinquished control of the litigation.  The interest the insurers claim in this litigation was a double contingency: first, that a judgment would be entered against King and second, that the insurers would be required to indemnify that judgment.  The second question will not be decided by this Court.  Rather, it will be decided in the context of the declaratory judgment actions pending in Illinois and Texas state court.  Thus, at most, the insurers assert an interest based on the first contingency.

As discussed previously, if the insurers were concerned about the nature and effectiveness of the defense in this action, they should have elected to provide a defense when asked by King to do so. As the Illinois Appellate Court recently observed, "[w]e remind Pekin that when Pekin declined coverage to XData, it chose to not undertake the defense.  Pekin charted its own course and cannot now complain that it would have had a better finish had XData not been in charge."  *Pekin Ins. Co. v. XData Solutions, Inc.*, 2011 IL App (1st) 102,769, ¶ 32, 2011 WL 4578485, *7 (Sept. 30, 2011).

Thus, to the extent that the insurers had an interest in there not being a judgment they might have to indemnify, it was incumbent upon them to protect that interest by appearing in this litigation when first apprised of it in 2009—either by accepting the tender of defense or seeking to intervene at that time.  By failing to do so, the insurers have waived their interest in the underlying litigation, reserving only their defense of their conduct in refusing to defend.

It is also important to note that the insurers' interest in this litigation is unchanged by the settlement. From the moment King tendered defense of the suit, the insurers knew that if there were a judgment against King and if there was coverage, the policies the insurers issued would require them to indemnify that judgment. They were presented at that time the opportunity to control King's defense and be in a position to affect whether a judgment was entered. They elected not to do so, allowing King's liability to be resolved wholly out of their hands. At the time they made that decision a settlement such as the one before the Court was a possibility, as was a large contested judgment. The fact that such a settlement has now come to pass does not alter the situation and justify intervention.

## II. THE SETTLEMENT IS EXPLICITLY GOVERNED BY ILLINOIS LAW, AND ILLINOIS LAW APPLIES IN ANY EVENT.

The Court noted at the January 13 hearing that Plaintiffs' response to the intervention motion recited Illinois case law standing for the proposition that the insurers will have an opportunity to contest the reasonableness of the settlement in the context of the coverage litigation. *See Guillen ex rel Guillen v. Potomac Ins. Co.*, 203 Ill. 2d 141, 158-63 (2003). The Court was interested in whether Texas law is in accord. While Texas appears to have taken a different approach, *see Evanston Ins. Co. v. ATOFINO Petrochemicals, Inc.*, 256 S.W.3d 660, 670-74 (Tex. 2008), at least one court applying Texas law has applied the *Guillen* standard. *See McGinnis v. Union Pacific R. Co.*, 612 F. Supp. 2d 776, 811 (S.D. Tex. 2009). More importantly, Illinois law, which clearly allows the insurers to contest reasonableness, should govern for a number of reasons.

First, the settlement agreement itself explicitly is governed by Illinois law. *See* Mtn. for Preliminary Approval, Dkt. 129, Ex. A thereto, p. 16. Second, once the settlement is consummated, all of the parties with a real interest in the outcome of the coverage litigation,

3

plaintiffs and the insurers, are Illinois entities. Third, plaintiffs concede that Illinois law applies to the issues in the coverage actions[1] and would stipulate to the same. Thus, there is no practical reason to fear that a court—whether in Illinois or in Texas—would apply Texas law and deprive the insurers the right to contest the reasonableness of the settlement.

Further, the Texas litigation is unlikely to get off the ground because that court lacks personal jurisdiction over either plaintiff, both of which are local Illinois businesses that do no business in Texas. Thus, the coverage fight between plaintiffs and the insurers will be had in Illinois state court, where it is exceedingly unlikely any standard other than that laid down in *Guillen* would be applied.

Finally, whether or not the insurers may contest the reasonableness of the settlement in the coverage litigation, none of the stated—or potential—reasons the insurers might have to intervene and contest the settlement in this action go to the determination this Court must make. The insurers contest the settlement because it might result in a judgment that the insurers would rather not pay; the Court's role in approving it is to safeguard the absent class members. *See, e.g., Isby v. Bayh*, 75 F. 3d 1191, 1198-99 (7th Cir. 1996). Thus, even if the insurers are correct that they have a general interest in anything that may lead to their obligation to pay money, their interests are not a factor in what remains in this case: the approval of the settlement as fair and reasonable to absent class members.[2] The insurers proffer no reasons why this settlement might

---

[1] Both Illinois and Texas have recognized coverage for TCPA claims. *See Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307 (Ill. 2006); *TIG Ins. Co. v. Dallas Basketball Ltd.*, 129 S.W.3d 232 (Tex. App. 2004).

[2] The notion that because satisfaction of the majority of the judgment is contingent on success in the coverage litigation, the Court should wait and see what happens there before approving the settlement is perverse and would kill the settlement either way: if the insurers were successful, the settlement would then be illusory and unfair to the class; if plaintiffs were successful, the insurers could take control of King's defense and seek to undo the deal made by King.

not be reasonable. Nor is it the insurers' role to do so; rather, the insurers argue that the imminence of a ripe duty to pay compels them to try to slow or stop the process. In sum, there is no reason to grant the motion to intervene and stay.

### III.  *ASHFORD GEAR* IS IRRELEVANT AND THERE ARE NO DECISIONS PROHIBITING SETTLEMENTS FOR INSURANCE PROCEEDS.

As the Court noted at the January 13 hearing, *Ashford Gear* has absolutely nothing to do with any of the issues relevant either to the instant motion or to this case in general. That case does not involve insurance coverage, a settlement, or the certification of a class and entry of a class-wide judgment pursuant to a settlement, for insurance proceeds or otherwise. *Guillen* explicitly condones settlements for insurance proceeds and sets the parameters under which they are enforceable. Counsel for plaintiffs is unaware of any decision in Illinois or from the Seventh Circuit prohibiting such settlements.

As for *Ashford Gear*, it was a decision that held that a district court applied the wrong standard in evaluating allegations of wrongdoing raised in challenging class certification. Significantly, the decision did not reverse the grant of class certification in that case; it vacated it for further consideration by the district court. The allegations raised by Ashford Gear are being tested in that proceeding. *See Creative Montessori Learning Centers v. Ashford Gear, LLC*, Case No. Case No. 09 CV 3963 (N.D. Ill.) (Gettleman, J.), Dkt. 178. Plaintiffs adopt and incorporate the supplemental memorandum in support of class certification filed in *Ashford Gear* that deals with the issues raised by the Seventh Circuit as though set forth herein.

In sum, the Seventh Circuit's *Ashford Gear* opinion reflects allegations as opposed to proven facts. The opinion was issued following a petition for leave to appeal that was not responded to. As discussed above, the opinion vacated a grant of certification for reconsideration of the certification question. Plaintiff in that case, for the first time, is presenting

a defense to the allegations. Specifically, the defendant in that case made two allegations: (1) that the marketing letter sent to the plaintiff in that case was misleading in some way and that (2) there was some promise made to a fax broadcaster concerning the use of certain records. Neither of those issues is relevant to this case: both plaintiffs here are longtime clients of Plaintiff's counsel and were not recruited via the marketing letter at issue in *Ashford Gear*, and this case does not involve the fax broadcaster at issue in that case.

In any event, it is well established that "plaintiffs have a right to contact members of the putative class." *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F. 3d 748, 759 (7th Cir. 2000), citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100-101 (1981) and *EEOC v. Mitsubishi Motor Mfg. of America, Inc.*, 102 F.3d 869, 870 (7th Cir. 1996). As Professor Newberg has observed, "[t]he issue of solicitation or 'lawyer created litigation' is often raised by defense counsel with the hope of attacking the ethical integrity of plaintiffs' counsel, and to thus raise questions about adequacy of representation." 5 NEWBERG ON CLASS ACTIONS, § 15:4 (4th ed.). The practicalities of class actions and the role of class counsel in modern society have been described as follows:

> There is some clamor about counsel generating this suit rather than the clients, and that this is unacceptable. In truth, class actions are inevitably the child of the lawyer rather than the client when the client's recovery is going to be small in relation to the costs of prosecuting the case. So the courts have, in recent years, applied less rigorous standards for the class representatives. There are cases in which lawyers find clients and precipitate cases where perhaps no one client would ever come forward to complain. I suppose lawyers going out to find clients is not the bad thing it was once thought to be. Legal policy has changed. Perhaps acceptance of class actions made this inevitable.

*Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 118 (N.D. Ill. 1993) (Zagel, J.).

This is especially true where, as here, the subject matter of the action is a statutory claim under a statute expressly designed to encourage citizens to act as private attorneys general in moving to stem the tide of an illegal practice that Congress judged to be highly disruptive and offensive. *See Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F. 3d 876,

881 (8th Cir. 2005). The small value of each individual plaintiff's claim would discourage initiation of individual suits. Thus, if enterprising class counsel could not seek class representatives and bring these cases as class actions, it would only increase the burden on the FCC and state and federal attorneys general to prevent junk faxes. Again, here, however, CE Design and Paldo Sign are longtime clients who were not solicited by any marketing letter.

With respect to the second issue, the true facts are as follows (as set forth and supported both in the *Ashford Gear* supplemental motion for class certification and *Nationwide Insurance Company v. New United, Inc.,* Case No. 11 CV 3182 (N.D. Ill.) (Dow, J.) (Dkt. 28)): Attorneys from Anderson + Wanca were in contact with Caroline Abraham about turning over records of fax broadcaster Business to Business Solutions ("Business to Business") in connection with the action styled *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 07 CV 5953 (N.D. Ill.) (Kendall, J.). One of the attorneys at one point made a statement in an e-mail that if she produced the records the records would be "confidential" pursuant to an attached protective order. Ms. Abraham responded that she wanted to discuss the issue first, so the lawyer flew to New York to take her deposition in another case and to discuss the matter. Ms. Abraham failed to appear, so the lawyer subpoenaed Joel Abraham (her adult son and an active participant in the Romanian junk fax operations) and Joel Abraham produced computer records through an experienced Washington, DC attorney. Neither of them contended any of the records were confidential or protected in any way. Neither referenced in any way any prior discussions with Ms. Abraham or any understandings they may have had based on them. There was no discussion about using the materials as evidence in other legal proceedings. Since obtaining the records, counsel has not published them in any forum, shared them with persons outside litigation efforts, or even produced them in litigation except pursuant to discovery requests from defendants.

7

Finally, the records were about the illegal fax activity of a massive criminal enterprise that had ceased many months earlier, after numerous FCC citations and civil litigation, but not before sending more than 15 million illegal faxes. Prior to that, Ms. Abraham had run a diploma mill and illegal international driver's license scheme.

After Judge Kendall denied her relief in *Finish Thompson*, Ms. Abraham and defense counsel in another case, *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 07 CV 5456 (N.D. Ill.) (Kennelly, J.), argued that the records had actually been produced in conjunction with that case and were subject to the protective order entered in that case. Abraham requested a protective order to stop counsel from using the records in pending cases or new cases. The court rejected that claim, holding that "[t]he Court concludes that neither Abraham nor Cy's Crabhouse has demonstrated good cause for keeping these materials confidential." *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 2010 WL 3327876 (N.D. Ill. Aug. 23, 2010). Abraham never appealed any order. Despite Judge Kennelly's ruling in *Cy's*, various defendants continued to raise issues regarding the Business to Business records.[3] The *Ashford Gear* ruling is the result of such unrebutted allegations in a petition for leave to appeal.[4] Again, however, this case has no connection to those computer records or that broadcaster.

---

[3] It is unclear what standing any defendant has to complain about a broken promise to Ms. Abraham, even if there was in fact a broken promise, or why such a promise would affect the admissibility of the evidence in civil actions against them. Further, even if a defendant in a liability case had any legal argument against use of the evidence, an absentee insurance company solely seeking to avoid paying on a judgment obtained against its insured following a settlement made by the insured defendant has no such argument.

[4] The reason the allegations were also unrebutted in the trial court record in the Ashford Gear case is because many were first raised by the defendant in a surreply in opposition to class certification and the court granted leave to file the surreply and specifically ordered that there would be no further briefing on class certification. *See Creative Montessori v. Ashford Gear*, Case No. 09 CV 3963 (N.D. Ill.) (Gettleman, J.), Dkt. 160, 162 and 163.

## **CONCLUSION**

The insurers have no interest here that would justify their intervention and a stay of the settlement, and they abandoned any interest they had when they refused the tender of defense. The Court should deny the insurers' motion and grant approval of the settlement.

Date: January 27, 2012.

Respectfully submitted,

By: /s/ Phillip A. Bock
One of the Attorneys for Plaintiffs

Brian J. Wanca
David M. Oppenheim
ANDERSON + WANCA
3701 Algonquin Road, Suite 760
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501

Phillip A. Bock
James M. Smith
BOCK & HATCH, LLC
134 N. La Salle Street, Suite 1000
Chicago, IL 60602
Telephone: (312) 658-5500
Facsimile: (312) 658-5555