IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CE DESIGN LTD., PALDO SIGN<br>AND DISPLAY CO., and ADDISON<br>AUTOMATICS, INC.,[1] Illinois corporations,<br>Individually and as the representatives of a<br>Class of similarly situated persons,<br><br>     Plaintiffs,<br><br>vs.<br><br>KING SUPPLY COMPANY, LLC d/b/a KING<br>ARCHITECTURAL METALS, INC.,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. 09 C 2057<br>Magistrate Judge Schenkier |

## MEMORANDUM OPINION AND ORDER[2]

On January 6, 2012, Valley Forge Insurance Company ("Valley Forge"), National Fire Insurance Company of Hartford ("National Fire") and Continental Casualty Company ("Continental"), hereinafter the "Insurers," filed a motion to intervene in this case, pursuant to Federal Rule of Civil Procedure 24, and to stay further proceedings pending resolution of certain litigation pending in state court (doc. # 154). For the reasons set forth below, the Insurers' motion to intervene is denied.

### I.

On February 26, 2009, CE Design Ltd. ("CE Design") filed a class action suit in the Circuit Court of Cook County, Illinois, alleging, *inter alia,* that defendant, King Supply Company, LLC

---

[1] The plaintiff, Addison Automatics, Inc. was dismissed voluntarily without opposition on January 13, 2012. Consequently, we will no longer include it as a plaintiff party in subsequent orders from this Court.

[2] On July 28, 2011, pursuant to the full consent of all parties, 28 U.S.C. § 636(c) and Local Rule 73.1, the Executive Committee reassigned this case to this Court for all proceedings, including the entry of final judgment (doc. ## 115, 118).

d/b/a King Architectural Metals ("King"), violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, by sending unsolicited faxes to plaintiffs on or about January 30 and February 8, 2009, and by transmitting the same or similar unsolicited faxes to many other persons. The original complaint also alleged a violation of the Illinois common law of conversion and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. King removed this suit to federal court on April 2, 2009 (doc. # 1).

Prior to suit, on March 20, 2008, Valley Forge issued a general, commercial liability policy to King, effective from March 20, 2008 to March 20, 2009 ("Valley Forge Policy"); on March 20, 2009, National Fire issued a similar policy to King, effective from March 20, 2009 to March 20, 2010 ("National Fire Policy"). In addition, Continental issued a commercial umbrella policy to King in effect for consecutive annual periods covering March 20, 2008 to March 20, 2010 ("Continental Policy"). Collectively, these three policies will be referred to as the "Policies." We will not delve into the details of the Policies, as those details are not material to the resolution of the pending motion.

The underlying lawsuit was filed approximately one month before the termination of the Valley Forge Policy. After King removed the case to federal court, it tendered this action to the Insurers for defense and indemnification. The Insurers denied coverage to King by correspondence dated April 30, 2009 (doc. # 166: Pls.' Opp'n Mem., Ex. A). While the letter invited King to produce additional information and to advise the Insurers if an "amended complaint is filed or other conditions change," the letter stated without qualification that the Insurers' analysis denying coverage "is dispositive" (*Id.* at 20).

2

The case thereafter was actively litigated by plaintiffs and King. On August 10, 2009, the district court granted King's motion to dismiss the state law claims (doc. # 25). On December 13, 2010, the district court granted plaintiffs' initial motion for class certification (doc. ## 91-92). Pursuant to Federal Rule of Civil Procedure 23(f), King sought an interlocutory review of the class certification order. The Seventh Circuit accepted interlocutory review, and on March 25, 2011, issued a published opinion vacating the class certification decision and remanding the case for further proceedings consistent with its order. *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011).

In its decision, the Seventh Circuit did not question the district court's ruling that the case met the elements required for class certification under Rules 23(a)(1)-(2) and (b)(3) of Federal Rule of Civil Procedure 23. *CE Design*, 637 F.3d at 724. However, the appeals court expressed reservations as to whether CE Design's claim was typical of those of other potential class members and whether CE could serve as an adequate class representative. *Id.* at 724-727. The court of appeals left those questions open and, on remand, advised the district court to re-examine evidence in the record regarding the adequacy of CE Design to act as the class representative. *Id.* at 727-728. The Seventh Circuit further stated that even if CE Design was not an adequate class representative, that would not necessarily sound the death knell for class certification, because other class representatives might step forth and/or certification of subclasses might be appropriate. *Id.* at 728. We note that the Seventh Circuit opinion garnered significant national publicity within the legal community. *See* William B. Rubenstein, 1 Newberg on Class Action § 3:68 (5th ed. 2012); 7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, & Richard L. Marcus, Federal Practice and Procedure §§ 1764, 1766 (3d ed. 2012). *See also* Joshua H. Threadcraft, *A Multi-million Dollar*

3

*Cottage Industry Likely Coming To A Court Near You*, 53 No. 9 DRI For Def. 72 (Sept. 2011); Joshua P. Davis & Eric L. Cramer, *A Questionable New Standard for Class Certification in Antitrust Cases*, 26 Antitrust 1, at 31 (Fall 2011); Maxwell M. Blecher & Joel R. Bennett, *Preparation and Trial of Federal Class Actions*, 21 Am. Jur. Trials 625, at § 7 (2012); Nick Vizy, *Advertising Law Update*, 292 Commercial Law Advisor NL2 (2012).

In light of the Seventh Circuit's comments, on March 25, 2011, the district court gave plaintiffs leave to add new plaintiffs to the case (doc. # 95). On April 25, 2011, the plaintiffs responded by filing a first amended complaint naming Paldo Sign and Display Company ("Paldo") and Addison Automatics, Inc. ("Addison") as two additional class representatives (doc. # 100). On March 25, 2011, the district court also referred the case to this Court for a settlement conference (doc. # 96). By an order dated April 16, 2011, the Court set a schedule for conducting a settlement conference (doc. # 98).

### A.

The first settlement conference was held with the Court on May 2, 2011 (doc. # 102). Due to the significant progress made by the parties toward settlement, the Court met with the parties five additional times over the course of the next two months: on May 12, 2011 (doc. # 104), June 14, 2011 (doc. # 107), June 23, 2011 (doc. # 108), June 30, 2011 (doc. # 112), and July 12, 2011 (doc. # 114 (plaintiffs' counsel did not appear at this status hearing)). The orders of June 23 and June 30 reflected that the parties were working on finalizing a term sheet. The July 12 order stated that the parties had agreed to a term sheet and were preparing a written settlement agreement. On July 28, 2011, the parties executed joint consents to have this Court hear all proceedings and enter a final

4

judgment in the case (doc. # 115), and on that date the case was reassigned to this Court for that purpose (doc. # 118).

On July 28, 2011, this Court set a date for a preliminary approval hearing of a class action settlement for August 17, 2011 (doc. # 117). By subsequent orders dated August 17 (doc. # 120) and September 8, 2011 (doc. # 121), the preliminary approval hearing date was reset, ultimately to September 28, 2011. On September 27, 2011, plaintiffs filed a motion for approval of a class action settlement, which attached a copy of the settlement agreement (doc. # 129).

On September 28, 2011, the Court conducted a hearing and gave preliminary approval of the class action settlement agreement and authorized notice to be sent to the settlement class (doc. #130). The Court granted the motion with modifications and set the matter for a final approval hearing on January 13, 2012 (*Id.*). The Court's preliminary approval order was entered into the public record on September 30, 2011 (doc. # 132).[3]

In its preliminary approval order, the Court certified a settlement class defined as:

> All persons who were sent any telephone facsimile message during the period January 1, 2009 to May 31, 2009 from King Architectural Metals but who did not directly request that King Architectural Metals send the specific facsimile they received.

(doc. # 132: Prelim. Approval Order at 1, ¶ 1). That settlement class includes approximately 143,000 persons to whom King sent 669,000 unsolicited advertisements by facsimile (*Id.* at 2).

The parties' settlement provided for the entry of a consent judgment against King in the total amount of $20 million (doc. # 129, Ex. A: Settlement Agreement at 7, ¶ 7). Under the TCPA, on a finding of liability, a plaintiff is entitled to recover $500.00 in statutory damages for each violation

---

[3]In light of the Court's approval of a settlement class, plaintiff's first amended complaint was stricken as moot (doc. # 130), and plaintiffs were given leave to (and did) file a second amended complaint. The second amended complaint allowed plaintiffs to replead the state law conversion claim previously dismissed (doc. # 133).

of 47 U.S.C. § 227(b)(3)(B), and up to $1,500.00 if the violation is willful (*Id.* at § 227(b)(3)). Based on the transmission of facsimiles to 143,000 persons, in this case King faced an excess of $71 million in potential damages even without regard to willfulness, and assuming that violations were counted by the number of persons receiving facsimiles and not the total number of 669,000 facsimiles that were sent.[4] The $20 million settlement figure represented a substantial discount of that potential damages exposure.

Because King had demonstrated that its ability to pay any judgment was extremely limited, plaintiffs agreed to seek recovery of only $200,000.00 of the settlement amount from King (Settlement Agreement at 7, ¶ 7).[5] In exchange for a covenant not to execute the remainder of the consent judgment against King ($19.8 million), King assigned its claims and rights against the Insurers under the Policies to the plaintiffs. Thus, plaintiffs shouldered the risk of collecting the remainder of the judgment only from the proceeds of King's Insurers, which plaintiffs knew would require them to "pursue an action and attempt to recover the Judgement against" the Insurers (*Id.* at 10, ¶ 10). Plaintiffs accepted that responsibility and that risk, fully knowing that the Insurers had "denied coverage and refused to defend" the claims at issue (*Id.* at 12, ¶ 12(I)).

Under the settlement agreement, the $200,000.00 to be paid by King would be used first to pay defray litigation costs incurred in this case to date (but not costs in litigating against the Insurers) (Settlement Agreement, at 11, ¶ 11). Under no circumstance would King be entitled to a reverter

---

[4] The parties disputed whether damages should be calculated based on the number of facsimiles sent. At $500.00 per facsimile, using the number of facsimiles sent (669,000) would result in a statutory damages figure of $334,500,000.00.

[5] King's limited ability to pay had been thoroughly vetted during the settlement process. The plaintiffs (and the Court) were satisfied that the $200,000.00 figure that it was agreed King would pay represented the most that King could pay without being forced into bankruptcy by its lenders.

of any portion of that $200,000.00 (*Id.* at 10, ¶ 10). Nor would plaintiffs' counsel be entitled to recover any fees from that $200,000.00 payment. The $200,000.00 amount paid by King (after deducting costs of this suit) would ultimately be distributed to the class (*Id.* at 7, ¶ 7). Any additional recovery to the class – as well as any incentive payment to the named plaintiffs, any payment for costs incurred by plaintiffs' counsel in pursuing recovery from the Insurers, and any payment of attorneys' fees at all – would be contingent on the ability of plaintiffs' counsel to obtain recovery from the Insurers (*Id.* at 9-10, ¶ 10).

## B.

Several things happened in response to entry of the preliminary approval order on September 30, 2011. *First,* class notice was sent by facsimile to 143,575 putative class members. Of these notices, 105,399 were delivered (doc. # 161: Pls.' Final Approval Mem., Ex. B (Clark Aff.) at ¶ 5). Only 255 person requested to be excluded (*Id.,* Ex. C (Smith Aff.) at ¶ 7)) – fewer than one-quarter of one percent of the 105,399 persons who received notice. A total of 15 persons objected to the settlement (*Id.,* Ex. C at ¶¶ 3-4). The persons who objected stated that they did so not because they considered recovery to the class inadequate or because most of it was contingent on a recovery from the Insurers. Rather, these persons stated that they objected because they disagreed with the TCPA and with the imposition of any liability on King at all (*Id.,* Exs. D - R).

*Second,* the Insurers learned of the settlement agreement (doc. # 174: 01/13/12 Tr. at 7). Upon learning of the agreement, the Insurers "promptly" filed a declaratory judgement action in Texas on November 15, 2011, seeking: (1) a ruling on whether they are obliged to provide coverage under the Policies for the claims asserted by plaintiffs in this case, and (2) a finding that the Settlement Agreement is not reasonable and was not made in good faith (doc. # 156: Insurers' Mem.

at 3, 6). On December 1, 2011, the plaintiffs, in turn, filed their own declaratory judgment action in Illinois state court seeking: (1) a determination that coverage exists for the claims asserted by plaintiffs against King in this action, and (2) a declaration that Continental is obligated to indemnify King for the Settlement Agreement under the umbrella policy issued to King on March 20, 2008 (Pls.' Resp. Mem. at 2 and Ex. B).

It was not until January 6, 2012, exactly one week before the scheduled final approval hearing, that the Insurers filed the pending motion to intervene and/or stay. At that time, the Insurers failed to comply with the requirement in Federal Rule of Civil Procedure 24(c) that they submit with their motion a "pleading that sets out the claim or defense for which intervention is sought." Given the late timing of their motion to intervene, the Court proceeded with the final approval hearing as scheduled on January 13, 2012. At that time, the Court stated its finding that final approval was warranted, as the settlement constitutes a fair, reasonable, and adequate resolution of the claims in this case. However, we deferred entry of final judgment until we could review and resolve the Insurers' motion (doc. # 167).

As part of the briefing on the motion, on February 17, 2012, the Insurers now have submitted their proposed complaint in intervention (doc. # 171, Ex. A). That proposed pleading expands upon the relief originally sought in the motion to intervene by asking that if the Court were to decline to stay this action pending resolution of the state coverage litigation, then this Court itself should enter declaratory relief that the Policies provide no coverage (Proposed Intervenor Compl., Counts II-III) or that the class settlement is not reasonable (*Id.*, Count IV).

8

## II.

The Insurers seek intervention as of right under Rule 24(a)(2) or, alternatively, by permission under Rule 24(b)(1) (Insurers' Mem. at 7).[6] Rule 24(a) provides for intervention of right, stating in relevant part: "[o]n timely motion, the court must permit anyone to intervene who: . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). In order to intervene as of right, moving parties must establish that: (1) their motion to intervene was timely; (2) they have a legally protected interest related to the subject matter of the litigation; (3) the disposition of the lawsuit will threaten to impair that interest; and (4) the proposed intervenor's interest will not be adequately represented by the existing parties. *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007). The burden is on the proposed intervenor to show that all four criteria are met; if all are not met, the district court must deny intervention of right. *Reid L. v. Ill. State Bd. of Ed.*, 289 F.3d 1009, 1017 (7th Cir. 2002).

Permissive intervention is covered by Rule 24(b). "On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Further, in exercising its discretion under permissive intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

---

[6] We treat the Insurers' request to proceed under Rule 24(b)(2), which applies to requests for permissive intervention by a government officer or agency, as a typographical error. The Insurers are not a government agency, and their brief argues the request under Rule 24(b)(1). We therefore address the Insurers' request for permissive intervention under Rule 24(b)(1), not (b)(2).

Applying these well-settled standards, we conclude that the Insurers have not established a basis for intervention as of right or by permission for two reasons. *First*, the Insurers' motion is not timely. *Second*, even if the motion had been timely filed, the Insurers have failed to establish the kind of interest in this litigation that would render intervention appropriate as of right or by permission. We address each of these points in turn.

## III.

District courts have broad discretion to determine whether a motion to intervene is timely. *Larson v. JPMorgan Chase & Co.*, 530 F.3d 578, 583-84 (7th Cir. 2008). "The timeliness inquiry is essentially a reasonableness inquiry, requiring potential intervenors to be reasonably diligent in learning of a suit that might affect their rights, and upon learning of such a suit, to act to intervene reasonably promptly." *People Who Care v. Rockford Bd. of Ed.*, 68 F.3d 172, 175 (7th Cir. 1995). The Seventh Circuit has established four factors for courts to consider in determining if a motion to intervene is timely: (1) the length of time the potential intervenor knew or should have known of its interest in the lawsuit; (2) the prejudice to the original party caused by the delay; (3) the resulting prejudice to the intervenor if the motion is denied; and (4) any other unusual circumstances. *Id.*

## A.

To begin with, plaintiffs and the Insurers disagree as to when the Court should start counting the length of time from which the Insurers knew or should have known of a potential interest in plaintiffs' lawsuit against King. The Insurers argue that their interests arose in October 2011, when they first learned that this Court had preliminarily approved a settlement. By contrast, plaintiffs argue that the Insurers should have known of any interest they had in the lawsuit when they denied coverage and declined to defend King in April 2009.

The Seventh Circuit has made clear that district courts should measure timeliness from the point when the potential intervenors learn that their interest "might be impaired." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995). "The relevant inquiry in determining timeliness [] is not on the time between the settlement and the motion to intervene, but instead is on the time between the [proposed intervenors'] knowledge that the suit could impact their interests and the motion to intervene." *Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003). Even a "[p]rompt filing of a motion to intervene after the settlement does not indicate timeliness, particularly where there is evidence that the intervenor should have known the suit could impact its interests for some time prior to that settlement." *Id.*

To resolve the dispute over when the timeliness clock starts, we must assess what interests the Insurers claim "might be impaired" absent intervention. In the proposed intervenor complaint (doc. # 171, Ex. A), the Insurers set forth four proposed causes of action. The first seeks a stay of this case pending a resolution of the coverage litigation the Insurers filed in Texas in November 2011 (Proposed Int. Compl., ¶¶ 57-63). If the Court does not grant a stay, the second and third proposed causes of action alternatively seek declaratory relief finding that the Insurers do not owe King a duty to defend or indemnify (*Id.*, ¶¶ 65-80). In the fourth proposed cause of action, the Insurers ask that if the Court does not stay this case and does not itself adjudicate the coverage issue and find that there is no coverage, we should find the class action settlement that we have approved (but not yet entered judgement on) is unreasonable and not binding on the Insurers (*Id.*, ¶¶ 81-87).

## 1.

In the first three proposed causes of action, the Insurers claim an interest in having a judicial determination of whether they were right in denying a defense or coverage to King before we enter

final judgment in this case. However, that interest was known to the Insurers when they elected to deny coverage in April 2009. The Insurers were well aware that this suit between plaintiffs and King would end in one of the only three ways in which any litigation ends: with a judgment for plaintiffs, with a judgment for King, or with a settlement.

In *Sokaogon Chippewa Cmty. v. Babbitt,* 214 F.3d 941, 949 (7th Cir. 2000), as in the instant case, the proposed intervenor attempted to argue that it did not know its interests could be impaired by the litigation until after it received the settlement agreement. The Seventh Circuit found the district court "was well within the bounds of reason" to find this argument unpersuasive, since from the filing of the complaint, the proposed intervenor "knew that there were only two possible outcomes of the litigation (and any settlement talks)." *Id.* at 949-50. Similarly, in *Reid L.,* 289 F.3d at 1017-18, the Seventh Circuit upheld the district court's determination that the motion to intervene was untimely where the proposed intervenors knew about the litigation over applying certification rules on a statewide basis, but "were content to participate on the sidelines for a long period of time." In that case, the proposed intervenors had waited to file their motion to intervene until they realized that the certification rules "were indeed" going to be applied on a state-wide basis and that the legislature would not be able to protect their interests. *Id.*

Likewise, the Insurers were well aware since the denial of coverage in April 2009 that they could have a coverage battle on their hands if the case turned out badly for King. Under the foregoing authorities, it was not the Insurers' knowledge of the particular outcome of this lawsuit that triggered any interest they may assert in joining this lawsuit; rather, it was the fact that this lawsuit could result in a judgment or settlement that might impair their interests. That much the

12

Insurers knew in April 2009. The Insurers were not entitled to sit on the sidelines and wait to see if that occurred before asserting their alleged interest.

The cases cited by the Insurers to support their argument that the timeliness of their petition should be measured from the time they learned of the settlement in October 2011 are inapposite. For example, in *United States v. City of Chicago*, 870 F.2d 1256 (7th Cir. 1989), the intervenors' interest arose from promotion decisions made only 46 days before the motion to intervene was filed, after a wholly unforeseen application of an eight-year old consent decree. *Id.* at 1263 (intervention permitted where prospective intervenors could not be expected to "anticipate that the remedial decree . . . would not merely eliminate the discrimination against blacks and Hispanics but [also] introduce blatant discrimination against whites"). *See also South v. Rowe*, 759 F.2d 610, 612 (7th Cir. 1985) (upholding district court's determination that motion to intervene was timely where, although the motion was filed a day before the consent decree was to expire, intervenor's counsel had learned only the previous month that completion of certain terms of the decree would be delayed to the detriment of intervenor's interests). That is not the case here, where a settlement between plaintiffs and King was not an unforeseen – or unforeseeable – outcome of this case.

Cases decided subsequent to *City of Chicago* only underscore the clear meaning of that decision: that the clock on filing a motion to intervene begins when the proposed intervenor is on notice that its interests *might* be impaired, *see, e.g., Reich*, 64 F.3d at 321, not when "its interests *actually will be* impaired" (doc. # 171: Insurers' Reply at 4 (emphasis added)). Indeed, the Insurers themselves concede that timeliness should be measured from the point when an intervenor knows its rights "could be impaired" (*Id.*). The *City of Chicago* decision did not stake out different ground, but merely applied this principle to a set of facts far different from those presented here. Thus, we

13

measure timeliness from the date the Insurers knew that plaintiffs or King would seek coverage – April 2009 – not when they learned that a settlement had been reached.[7]

### 2.

In their fourth proposed cause of action, the Insurers claim an interest in having the Court find the class action settlement unreasonable and not binding on the Insurers. As with the first three causes of action in the proposed intervenor complaint, the Insurers were surely aware that this case might settle and that TCPA cases can result in substantial judgments or settlements for plaintiff classes. After all, the TCPA permits $500.00 in statutory damages with the possibility of treble damages for each violation – *i.e.*, for each unsolicited facsimile sent – and, with no upper limit on damage awards. 47 U.S.C. § 227(b)(3). *See, e.g., Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1305 n.1 (11th Cir. 2008) (in settlement agreement, the defendant had consented to a $12 million judgment, which was calculated by multiplying the 24,000 unsolicited facsimile advertisements it transmitted by $500.00, and the defendant had assigned the plaintiff its right to seek insurance coverage under its policy); *Hinman v. M & M Rental Ctr., Inc.*, 06 C 1156, slip op. at 4-7 (N.D. Ill. Oct. 6, 2009) (final approval given to TCPA settlement of $5,817,150 in case involving the transmission of 20,756 facsimiles); *In re United Artists Theatre Co.*, 410 B.R. 385, 390 (Bankr. D. Del. 2009) (in underlying case, summary judgment entered in 2003 in favor of the class for at least 57,600 TCPA violations, resulting in an aggregate statutory damage award of $28.8 million plus prejudgment interest); *see also* Yuri R. Linetsky, *Protection of "Innocent Lawbreakers": Striking*

---

[7]Moreover, we are not persuaded that the Insurers' motion to intervene would be timely even if we measured from October 2011. We do not see a reason for the Insurers to have waited nearly three months to move to intervene – nearly two months after they filed a state court suit for declaratory judgment on coverage and on the eve of the final approval hearing of the class settlement in this case.

*the Right Balance in the Private Enforcement of the Anti "Junk Fax" Provisions of the Telephone Consumer Protection Act*, 90 Neb. L. Rev. 70, 93 (2011) (citing cases entering million dollar-plus judgments). The Insurers were not entitled to wait for the particular result in this case to assert their alleged interest.

That said, for the fourth proposed cause of action, the Insurers make a pass at articulating specific reasons why their discovery of the particulars of the settlement in October 2011 should be the triggering event in determining the timeliness of their petition to intervene. *First*, the Insurers argue that plaintiffs cannot prove delivery of the facsimiles in issue to each class member (Proposed Int. Compl., ¶ 85). However, we know that notice of the settlement was successfully delivered by facsimile to more than 105,000 class members. That constitutes a reasonable barometer of the plaintiffs' ability to prove delivery of the offending facsimiles to at least that many persons. And, at a statutory *minimum* of $500.00 for each person who received a facsimile, that would amount to more than $50 million – two and one-half times the settlement amount. The $20 million figure thus represented a 60 percent discount over what likely would have been a minimum damages award if liability was established.

*Second*, the Insurers contend that plaintiffs and King acted collusively in reaching settlement (Proposed Int. Compl., ¶ 82). This argument is a non-starter. The settlement was the product of extensive and often combative negotiations that extended over more than a two-month period, and that involved multiple sessions with this Court. The decision by plaintiffs to agree that King would pay $200,000.00 of the settlement amount came only after thorough efforts by plaintiffs to determine whether King could pay more, and only after plaintiffs reasonably determined that King could not do so. This is not a situation where it can be said that plaintiffs' attorneys settled out cheaply for the

15

class in order to secure their own fees. While the class bears the risk that it will recover nothing beyond the $200,000.00 paid by King if the Insurers prevail on their coverage position, plaintiffs' attorneys share in that risk – and more. The attorneys will get no fees at all unless they recover against the Insurers, and the attorneys will have to incur even more time and expense in pursuing litigation to recover from the Insurers. Plaintiffs' attorneys had no motive for agreeing to such an arrangement if they believed King could pay more. These were among the factors the Court considered before giving approval to the settlement.

*Third*, the Insurers raise a question about the validity of the structure of the settlement here: an agreement by plaintiffs to recover only a small portion from King, in exchange for King assigning its rights against the Insurers so that the plaintiffs can seek to collect the rest (or some portion of it) from the Insurers (Insurers' Mem. at 11). However, when pressed, the Insurers conceded that they could find no case that disapproves of that settlement structure. Nor do the Insurers cite to any provision of the insurance contracts that forbid such an assignment. Indeed, in this Court's experience, this structure is not an uncommon one. *See, e.g., Nationwide Ins. Co. v. New United, Inc.*, 11 C 3182, 2012 WL 1866358, at *1 (N.D. Ill. May 22, 2012) (explaining that parties settled TCPA action for approximately $2 million, but the settlement and consent judgment approved by the court provided that plaintiffs would only pursue recovery against defendant's insurers), *see also Penzer*, 545 F.3d at 1305 n.1.

*Fourth,* the Insurers' claim that they seek to protect the class (Insurers' Reply at 10-11) is implausible. The class has named representatives and class counsel to represent their interests. The representatives and class counsel have interests aligned with the those of unnamed class members: to maximize the recovery that can be achieved in this case. This is why plaintiffs obtained an

assignment of King's claims against the Insurers for coverage – to try to obtain a far greater recovery than could be achieved from King alone. By contrast, the proposed intervenor complaint confirms what already was evident: the Insurers' interests are in direct conflict with the class members. The Insurers seek to avoid coverage, and if there is coverage, to minimize (or eliminate) the amount they would have to pay. The settlement is not unreasonable simply because the ability of the class to recover more than $200,000.00 remains contingent upon the outcome of the state court litigation with the Insurers. King can pay no more than $200,000.00, and the settlement secures that amount. The class members were fully informed of the contingency as to the remaining $19.8 million in the class notice; yet, only a very small percentage of the class members opted out. And, the 15 class members who objected did so because they disagree with the wisdom of the TCPA, and not with the adequacy of the settlement reached.

### 3.

In *Sokaogon*, the court cautioned that where a movant "waited until settlement was imminent" to seek intervention, that "strongly suggests that [the prospective intervenor] was not interested in intervening in the *litigation*, but in blocking a settlement between the parties – or, at a minimum, this settlement." 214 F.3d at 948 (emphasis in original). Plainly, that is the purpose of the Insurers' proposed fourth cause of action: if it turns out that they have an obligation to provide coverage, they do not want to have to cover *this* settlement.

The Insurers complain that the settlement was reached in a proceeding where they "have been left completely exposed and unrepresented" (Insurers' Mem. at 10). However, the risk that the Insurers would have to provide coverage pursuant to a settlement agreement in which they did not participate arose when the Insurers elected to deny coverage in April 2009. It was at that point that

the Insurers unequivocally disclaimed any responsibility to King for defense or coverage, and as a result, elected not to have a seat at the table in helping to shape King's approach to the litigation or its settlement.

While plaintiffs say the Insurers thus "abandoned" King (Pls.' Opp'n Mem. at 2), we do not adopt that pejorative label. Perhaps the Insurers were correct in deciding that this case does not invoke coverage of defense obligations under the Policies – that question will be sorted out in the state court litigation. But that decision had consequences. One of them was that the Insurers left King to fend for itself in this litigation. Another is that the Insurers gave up the ability they would have had, if they defended the case, to influence (or dictate) the litigation and settlement strategy. *See, e.g., Pietras v. Sentry Ins. Co.*, 513 F. Supp. 2d 983, 986 (N.D. Ill. 2007) (upholding a settlement where insurers, who had declined to defend the insured, objected that they were insufficiently represented because the "insured parties had no incentive to contest liability or damages because of the availability of insurance"); *Armstrong Cleaners, Inc. v. Erie Ins. Exch.*, 364 F. Supp. 2d 797, 805 (S.D. Ind. 2005) (insurers "estopped from challenging the insured's handling of the underlying case" where they had declined to defend). When the Insurers now complain that they were unrepresented in King's decision to settle and how to do so, the Insurers complain about a circumstance of their own making.

The Insurers thus were on notice of multiple potential risks in April 2009: the risk that King would file a declaratory judgment action, and the risk that even absent such an action, plaintiffs would recover in this case and that attention would then turn to the Policies as a source of recovery. This notice was sufficient to trigger the Insurers' duty to take action if they believed they had an interest that needed to be protected. Accordingly, we find that the Insurers knew or should have

known of their interest in the lawsuit in April 2009, almost three years before they filed their motion to intervene on January 6, 2012 (doc. # 154).

## B.

In determining whether the Insurers' motion to intervene is timely, we do not look solely to the length of time the Insurers knew or should have known of their interest in the lawsuit. We also must weigh the prejudice to the original parties caused by the delay in seeking intervention and any prejudice to the intervenor if the motion is denied. *Heartwood*, 316 F.3d at 701. "The purpose of the [timeliness] requirement is to prevent a tardy intervener from derailing a lawsuit within sight of the terminal." *Sokaogon*, 214 F.3d at 949. We therefore are wary of requests to intervene where the proposed interveners knew "all along that [their] interests [were] directly pitted against those of" one of the parties. *Id.* at 950.

That is precisely the case here. If their April 2009 coverage decision did not withstand adjudication in a contested proceeding, the Insurers plainly would want the case to be resolved in favor of King (and thus contrary to plaintiffs' interests). Or, if the case went to judgment in favor of plaintiffs, the Insurers would want any award to be as low as possible (again, contrary to plaintiffs' interests). If the case settled, the Insurers would want the settlement amount to be as low as possible – contrary to plaintiffs' interest in maximizing recovery, and contrary to the interest of King in disentangling itself from the cost and burden of continued litigation for a reasonable (but not necessarily the lowest conceivable) dollar figure.

The Insurers' attempt to derail the settlement upon the brink of resolution of the case, if permitted, would prejudice both plaintiffs and King. It would unravel a heavily negotiated settlement agreement that enables King, the Insurers' customer, to extricate itself from expensive

19

and burdensome litigation. Moreover, if there is a finding of no coverage in the state litigation, intervention by the Insurers would unnecessarily delay resolution of this case, since the class has made it clear that they do not find objectionable a settlement that might net only $200,000.00 in recovery (the result if there is a finding of no coverage). If there is a finding of coverage, under the Insurers' fourth proposed cause of action, the Insurers would assert the right to challenge anew the reasonableness of the settlement – a point that the Insurers confirmed during oral argument (04/09/12 Tr. at 32-33). That would render a dead letter the extensive process that already has been undertaken of providing notice to some 105,000 class members and obtaining their input on the reasonableness of the settlement. To allow the Insurers to achieve this result would run afoul of the principle that "[p]eople potentially affected by the decision can't sit on the sidelines, as if intervention were a petition for rehearing." *United States v. Blagojevich*, 612 F.3d 558, 561 (7th Cir. 2010).

On the other side of the ledger, we find that any alleged prejudice that the Insurers claim they would suffer absent intervention is illusory, or of the Insurers' own making. The Insurers claim that they were kept in the dark about the settlement until it was too late for them to have a say in it (Insurers' Mem. at 2). But, as explained above, that is the result of two independent choices that the Insurers made long ago: (1) to decline coverage and seek no further involvement in the case, rather than defend the case for King under a reservation of rights (which would have ensured them a seat at the negotiating table and a say in the settlement); and (2) to completely ignore the course of this litigation once they decided to decline coverage (until the settlement was brought to their attention by a broker in October 2011) (04/09/12 Tr. at 6).

These, of course, were decisions that the Insurers were entitled to make. But, they cannot claim prejudice because the natural result of these decisions was that they were not involved in

helping to shape the settlement that was reached. Ignoring the developments in this case was a conscious – and risky – decision the Insurers made. While the Insurers attempt to make much of the parties' agreement not to inform the Insurers of the settlement (Insurers' Mem. at 2-3), the Insurers fail to acknowledge that the settlement process – which began in May 2011 – was hardly a secret. There are at least 10 docket entries between May 2, 2011 and September 27, 2011 that disclose that the parties were in various stages of negotiating, documenting, and submitting for preliminary approval a class settlement (doc. ## 102, 104, 107, 108, 112, 114, 117, 120, 121, and 129). "[P]otential interveners need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *Reich*, 64 F.3d at 321. We do not view it as "reasonably diligent" for an insurer to completely ignore the developments in a case once it has decided to deny coverage.

The Insurers claim that it is not worth the expenditure of their resources to monitor developments in cases where they deny coverage (04/09/12 Tr. at 9). The Insurers are free to decide that the cost of monitoring those cases is not worth the benefit they could achieve by learning about developments in a case that might cause the Insurers to take action – such as, for example, the development here of parties embarking on serious settlement discussions after the case was remanded from the Seventh Circuit. But, the Insurers are not entitled to have the Court insulate them from the risks entailed by that cost-benefit decision, by permitting a last-minute intervention that seeks to undo a settlement that the parties have achieved.

The Insurers also claim that they will suffer prejudice if a judgment approving the settlement is reached here before the Insurers obtain an adjudication of the coverage question in state court. The Insurers argue that if a final judgment issues in this case approving the settlement as reasonable,

21

then they will be stuck with that decision if they lose on the question of coverage (Insurers' Reply at 13-14). This argument fails for a number of reasons.

The alleged prejudice that the Insurers fear is speculative in two regards. At the threshold, if the Insurers are right about their coverage position, they will suffer no prejudice whatsoever since they will have no responsibility to pay any of the settlement amount. Moreover, even if their denial of coverage was erroneous, that will not preclude the Insurers from challenging in state court whether the settlement amount was reasonable. The parties all agree that if the coverage question is decided in the action in Illinois state court, the Insurers will be able to challenge the reasonableness of the settlement amount even if they lose on the question of coverage. *See Guillen ex rel. Guillen v. Potomac Ins. Co.,* 785 N.E.2d 1, 14-15 (Ill. 2003); *Stonecrafters Inc. v. Wholesale Life Ins. Brokerage, Inc.,* 915 N.E.2d 51, 58–64 (Ill. App. Ct. 2009). There may be somewhat more uncertainty about this under Texas law. *Compare Evanston Ins. Co. v. ATOFINA Petrochems., Inc.,* 256 S.W.3d 660, 671 (Tex. 2008) (insurers barred from challenging reasonableness of settlement if insurers denied coverage at outset of litigation) *with McGinnis v. Union Pac. R.R.Co.,* 612 F. Supp. 2d 776, 811 (S.D. Tex. 2009) ("[A]n insurer who wrongfully failed to defend its insured is liable for any damages assessed against the insured, up to the policy limits, subject only to the condition that any settlement be reasonable"). However, plaintiffs have eliminated that uncertainty by conceding that if the coverage question is decided in the Texas action, they will not argue that this Court's determination of reasonableness is binding on the Insurers (04/09/12 Tr. at 24-27).

The Insurers argue that even if not binding, a reasonableness determination by this Court would be persuasive in a state court action and thus would put the Insurers behind the proverbial eight-ball in challenging the reasonableness of the settlement (04/09/12 Tr. at 29-31). Perhaps so,

although that would depend on the quality of the evidence and arguments mustered by the Insurers to challenge this Court's determination of reasonableness. But even if a reasonableness determination in this Court would impair the ability of the Insurers to challenge the reasonableness of the settlement in the state court coverage actions, that impairment would be nothing more than the natural consequence of the Insurers' decisions to deny coverage and then wait for more than two and one-half years to file a coverage action. Once they denied coverage, the Insurers were free at any time to file suit to seek a declaration of their obligation to defend or indemnify King. They chose not to do so, apparently because they did not consider the risk presented to the Insurers by this case sufficient to warrant that action. Again, that is a decision the Insurers had the right to make. But, what they lack is the right to make this Court (or the parties to this case) the guarantors of that risk by allowing them to escape the consequences of their strategic decision. We do not find convincing pleas of prejudice that are of the Insurers' own making.

In sum, we find that the Insurers' petition to intervene is untimely, that the parties to this case would suffer prejudice if intervention is allowed, and that absent intervention the Insurers would suffer no prejudice that is sufficient to warrant their belated entry into the case. We therefore deny the petition to intervene of right and for permissive intervention for failure to satisfy the threshold requirement of timeliness.

## IV.

In addressing the threshold issue of timeliness, we have indulged the assumption that the Insurers have an interest in this litigation such that, on a timely motion, intervention might be appropriate under Rule 24(a) or (b). We write further to explain that intervention here would not be warranted in any event. The Insurers lack an "interest in the property or transaction that is the

subject of the action," as required for intervention as of right under Rule 24(a). And, the Insurers lack "a claim or defense that shares with the main action a common question of law or fact," as is required for permissive intervention under Rule 24(b).

## A.

To intervene as of right, under Rule 24(a), a movant must demonstrate that its interest in the litigation is "direct and concrete," and entitled to "legal protection." *Diamond v. Charles,* 476 U.S. 54, 75 (1986). This is a "highly fact-specific determination." *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995). A proposed intervenor must show an interest that is something less than a property interest, but that is more than a "betting interest." *Id.* at 1380-81. The evaluation of a proposed intervenor's interest focuses "on the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *Reich,* 64 F.3d at 322.

Here, the Insurers assert a financial interest. They argue that "[t]he Settlement makes clear that the predominant source of recovery for the Consent Judgment is King['s] insurance policies, including the Policies issued by [the Insurers]" (Insurers' Mem. at 10). The Insurers claim that their interest in this – essentially, to be free of any obligation under the Policies to pay for the settlement that King negotiated – is "direct, significant, [and] legally protectable," and that "intervention in this lawsuit is appropriate as of right" (*Id.*).

However, the Insurers' interest is not the "interest relating to the property or transaction that is the subject of the action," as contemplated by Rule 24(a). Fed. R. Civ. P. 24(a)(2). The subject of this action is King's liability to pay plaintiffs' damages on the TCPA and/or state law claims, *not* whether the Insurers owe King a duty of defense or coverage under the Policies.

24

The settlement agreement itself does not impose liability under the Policies, just as a judgment – if one had been rendered against King on summary judgment or after trial – would not impose liability under the Policies. While the settlement exposes the Insurers to liability, any obligation of the Insurers to pay will turn on whether the state court litigation in Texas or Illinois vindicates their coverage decision or proves it to have been in error. That decision will turn on an analysis of the Insurers' obligation to King under the policies – not on the factual or legal question presented in this lawsuit as to whether King violated the rights of plaintiffs.

The Insurers argue they have an interest in the property or transaction in this case sufficient to give them a right to intervene, yet they have not cited any case where an insurer is allowed to intervene as of right in a suit seeking to impose liability against its insured. Had this case resulted in a judgment against King after a trial, the Insurers would have had no right to intervene and set aside the judgment. They have no better claim to a right to enter this case to set aside the settlement. We reject the proposition that an insurer has a right to intervene as a party to a lawsuit merely because its insured might incur (or does incur) liability that the insurer may have to cover.

Moreover, the fact that the case hit the Insurers' radar screen only after they learned of a settlement – after two-and-one half years of being actively litigated at the trial level and on appeal – simply underscores that their interest is not in the property or transaction in this case, but rather in their potential liability to pay under the Policies which are *not* the property or transaction in this case. Thus, we find that the Insurers lack an interest in the property or transaction in this case sufficient to give them a right to intervene under Rule 24(a).

**B.**

The Insurers fare no better in their request for permissive intervention. To obtain permissive

intervention under Rule 24(b), the Insurers must show that they share with the other parties in this

case a common question of law or fact. Fed. R. Civ. P. 24(b)(1)(B). The common questions the

Insurers assert are: (1) whether the settlement structure and monetary amount of the Consent

Judgment is reasonable and was made in good faith; (2) whether King is legally obligated to pay the

plaintiff class damages; and (3) whether class counsel is adequate (*See* Insurers' Mem. at 10–11).

The settlement structure in this case – which permits assignment of King's rights under the

Policies to plaintiffs – does not constitute a common question of law or fact with the subject matter

of the lawsuit. There is no question that this structure is valid. An insurance policy gives an insured

certain rights and, absent circumstances not applicable here, those rights may be assigned. *See*

*Maneikis v. St. Paul Ins.*, 655 F.2d 818, 826 (7th Cir. 1981) ("Policy provision[s] . . . can only

prohibit assignment of policy coverage, not assignment of an accrued cause of action"); *see also*

*UNR Indus. v. Continental Cas. Co.*, 942 F.2d 1101, 1109 (7th Cir. 1991) (providing example that

where defendant is unable to pay the full amount of damages to the plaintiffs, the defendant may give

the plaintiffs a partial monetary settlement and assign the plaintiffs its right to sue the insurer for the

rest of the damages, subject to the policy limit).[8] The Insurers concede that they have no case law

---

[8] *See also* Restatement 2d of Contracts § 317, which states:

(1) An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.
(2) A contractual right can be assigned unless
(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or
(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or
(c) assignment is validly precluded by contract.

holding that an assignment of insurance coverage rights as consideration for a covenant not to execute in a settlement agreement is legally impermissible.

Moreover, this argument, as well as Insurers' remaining asserted common questions, are – in substance – challenges to the reasonableness of the settlement. The Insurers' fourth cause of action in the proposed complaint in intervention would ask this Court to let it step into the case and to argue that the Court should undo the settlement that the parties deem reasonable; that was accepted without criticism by all but 270 of the 105,000 class members who received notice; and that this Court has approved. We reject the proposition that an insurer who denies a defense or coverage can – if the case is resolved in a way the insurer dislikes – gain entry into the case by asserting a common question of fact or law based on the insurer's desire to undo the bargain struck by the insured. Moreover, for the reasons stated above, intervention at this late date would unduly delay and would prejudice the adjudication of the original parties' rights. We therefore deny permissive intervention under Rule 24(a)(2).

---

*See* RESTAT. 2D CONTR. § 317 (2012).

## CONCLUSION

For the reasons set forth above, the Court denies the Insurers' Motion to Intervene under Rule 24(a) and (b); and we deny the request to stay as moot. By a separate order, we will enter final approval of the class settlement and final judgment.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: July 20, 2012**

28